IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CYNTHIA LEWIS,                          )
                                        )
                Plaintiff,              )
        v.                              )       CASE NO. 2:09-CV-862-WKW [WO]
                                        )
DEPUTY JASON BLUE, *et al.*,            )
                                        )
                Defendants.             )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Cynthia Lewis ("Plaintiff")[1] claims that Sheriff's Deputy Jason Blue ("Deputy Blue") with the Butler County Sheriff's Department used excessive force in arresting her and subsequently performed an unlawful search and seizure inside her home. Plaintiff brings her 42 U.S.C. § 1983 claims against Deputy Blue in his individual capacity alleging violations of her Fourth Amendment rights.

Before the court is Deputy Blue's motion for summary judgment (Doc. # 43), which is accompanied by a supporting brief and an evidentiary submission (Doc. # 44). Plaintiff filed a response in opposition (Doc. # 46), to which Deputy Blue replied (Doc. # 52). After careful consideration of the arguments of counsel, the applicable law and the record as a whole, the court finds that the motion is due to be granted.

---

[1] To avoid confusion between Mrs. Lewis and her husband, Mr. Lorenzo Lewis, the court will refer to Mrs. Lewis as "Plaintiff" throughout the order.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

2

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted). "At the summary judgment stage, . . . once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the defendant's] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position

3

will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").

Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

4

## IV.  FACTS[2]

While the material facts surrounding the arrest of Plaintiff and subsequent search of

her home are hotly contested, at this juncture, Plaintiff's version of the events is credited to

the extent that it does not plainly contradict the video and audio of the incident.  The events

giving rise to this cause of action occurred on August 11, 2008, when Lorenzo Lewis ("Mr.

Lewis"), accompanied by Deputy Blue, returned to a mobile home where Plaintiff resided

to retrieve a vehicle and a pair of shoes so Mr. Lewis could go to work.  Before detailing the

events of that day, some pertinent background is necessary.

### A.    Plaintiff and Mr. Lewis

Plaintiff and Mr. Lewis have been married since 1985.[3]  (Pl. Dep. 17 (Doc. # 46, Ex.

1).)  In the months leading up to August 11, 2008, they had been living together in a mobile

home (the "home") off Simpson Road in Butler County.  (Pl. Dep. 20, 88.)  Plaintiff had

purchased the property in 1996, and she bought the mobile home in 2001.  (Pl. Dep. 20.)  The

mortgage on the property was in Plaintiff's name.[4]  (Pl. Dep. 30.)  Having resided there with

Plaintiff for several months, Mr. Lewis had some clothes, shoes, and other possessions at this

home.  (Pl. Dep 133-35.)  Plaintiff and Mr. Lewis also had two cars, a Pontiac Grand Prix

---

[2] The actual facts may be different than those stated here.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]acts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.  Nevertheless, for summary judgment purposes, [the] analysis must begin with a description of the facts in the light most favorable to the plaintiff.") (citation and internal quotation marks omitted).

[3] Plaintiff and Mr. Lewis were married during all the events in question in this case.

[4] Plaintiff later sold this property to her son, but that is not pertinent to the events in question. (Pl. Dep. 25-26.)

(the "car") and a Chevrolet Silverado truck (the "truck"), which were located on the property on the date in question.  (L. Lewis Dep. 23-24.)  Mr. Lewis purchased both vehicles, and they were registered in his name; however, Plaintiff used both vehicles, and the car was specifically purchased for Plaintiff's use.  (L. Lewis 23-24; Pl. Dep. 102.)   In the days leading up to August 11, 2008, Plaintiff and Mr. Lewis encountered marital difficulties that resulted in a disagreement about possession and use of the aforementioned property.

## B.     Mr. Lewis Goes to Stay with His Mother

On the evening of Saturday, August 9, 2008, while riding home from Florida with her sister, Plaintiff saw Mr. Lewis driving the truck into a convenience store parking lot in Georgiana, Alabama, with another woman in the truck.[5]  (Pl. Dep. 78-79.)  Based on prior dealings, Plaintiff was suspicious of the other woman riding in the truck with her husband.  (Pl. Dep. 78-81.)  Upon seeing Mr. Lewis park the truck, Plaintiff told her sister to pull into that parking lot.  (Pl. Dep. 82.)  After Plaintiff got out of the car, her sister drove away.  (Pl. Dep. 82.)  Plaintiff then got into the truck, told the other woman to get out of the vehicle, and drove the truck home without her husband.[6]  (Pl. Dep. 82-83.)  Mr. Lewis then hitched a ride from an unidentified individual and was dropped off at the home, where he had been living with his wife for a few months.  (Pl. Dep. 88; L. Lewis Dep. 45 (Doc. # 46, Ex. 3).)  Mr. Lewis was not able to get into the home because Plaintiff had his house key and she told him

---

[5] Mr. Lewis claims that the other woman's uncle and her baby were also in the truck at this point, but Plaintiff makes no mention of these individuals.  (L. Lewis. Dep. 39.)

[6] Mr. Lewis had left the keys to the truck and his keys to the house in the ignition while he was in the convenience store.  (L. Lewis Dep. 38; Pl. Dep. 89.)

she did not want him coming into the house or staying on the porch.  (Pl. Dep. 87-89.)

Plaintiff then called the Butler County Sheriff's Department to have Mr. Lewis removed

from the property.  (Pl. Dep. 89-91.)  Two sheriff's deputies arrived and gave Mr. Lewis a

ride to his mother's house, where he stayed at least two nights.  (L. Lewis Dep. 48.)  Nobody

was arrested, and no charges were filed.  (Pl. Dep. 93; L. Lewis Dep. 48.)  Plaintiff and Mr.

Lewis had no further contact until the morning of August 11, 2008.  (Pl. Dep. 95.)

**C.**     **August 11, 2008**

   *1.*     ***Mr. Lewis Returns to Plaintiff's House Without the Sheriff's Department***

On the morning of Monday, August 11, 2008, an unknown Butler County Sheriff's

Deputy called Plaintiff to ask if Mr. Lewis could come to the house to retrieve a vehicle.[7]

(Pl. Dep. 95-97.)  Plaintiff told the Deputy that Mr. Lewis could come get the car and that

a Deputy did not need to accompany Mr. Lewis.  (Pl. Dep 96-97.)  Mr. Lewis, along with his

niece, Tamika Toles, then drove to Plaintiff's house, and Ms. Toles parked in the street in

front of the house.  (Pl. Dep. 98.)  Plaintiff told Mr. Lewis to "stay back" until she retrieved

her belongings from the car, but Mr. Lewis "went to running off at the mouth."  (Pl. Dep.

98.)  Mr. Lewis continued to approach, so Plaintiff said, "[L]ook, that's it, I'm going in the

house."  (Pl. Dep. 99.)  Mr. Lewis wanted to retrieve the truck, but was unable to get either

vehicle because he did not have the keys to them.  (L. Lewis Dep. 56; Pl. Dep. 83.)

---

[7] The deputy's identity is unknown and inconsequential at this time.

Mr. Lewis then returned to the Butler County's Sheriff's Office to ask for assistance in retrieving the truck.  (L. Lewis Dep. 58.)  Mr. Lewis recalls that Sheriff Harden told him that he would send a Sheriff's Deputy out to assist Mr. Lewis, but it was Plaintiff's decision which vehicle he could take.  (L. Lewis Dep. 58-59.)  Mr. Lewis returned to Plaintiff's residence with his niece and waited on the street outside the home for a Sheriff's Deputy to arrive.  (L. Lewis Dep. 59-60.)

While Mr. Lewis was at the Sheriff's Department, Plaintiff attempted to start the car so that she could move it to the street for Mr. Lewis.  (Pl. Dep. 114-15.)  The car had been having mechanical problems, and Plaintiff was unable to get it started.  (Pl. Dep. 115.)

### 2. *Deputy Blue Arrives at Plaintiff's Home*

Deputy Blue then arrived on the scene in his Sheriff's Department sport utility vehicle (the "Sheriff's SUV").  (Pl. Dep. 115.)  Deputy Blue parked his Sheriff's SUV in the driveway of Plaintiff's home, directly behind the car and the truck.  (Pl. Dep. 115.)  From this point forward, Deputy Blue's dashboard mounted video camera recorded audio and video of the morning's events.[8]  (Doc. # 46, Ex. 9 ("Video").)

When Deputy Blue arrived, Plaintiff was standing in front of the front porch of her home.  (Pl. Dep. 116.)  The car's hood was up because Plaintiff had been looking at the

---

[8] The dash mounted camera recorded video of the events that occurred directly in front of the Sheriff's SUV, in the vicinity of the car and the truck.  Deputy Blue's microphone, however, recorded the audio of all the events that occurred near him as he moved around the property.  "Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account."  *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

battery cables to determine why the car would not start.  (Pl. Dep. 118; Video, Disc 1, Part 1 at 00:49.)  Deputy Blue exited the vehicle and began talking to Plaintiff, who told Deputy Blue that she did not want Mr. Lewis on the property.  (Pl. Dep. 119.)  Deputy Blue then told Mr. Lewis to come onto the property.  (Pl. Dep. 119.) Mr. Lewis had told Deputy Blue that he wanted to retrieve the truck, that he and Plaintiff were married, that he had been unable to retrieve the truck earlier that morning, that he had lived at the house until that Saturday night, and that he did not know what Plaintiff was doing to the car.  (Video, Disc 1, Part 1, at 1:30.)  Deputy Blue then told Mr. Lewis to come with him on to the property.  (Video, Disc 1, Part 1, at 2:40; Pl. Dep. 119.)  Mr. Lewis also confirmed to Deputy Blue that the house was their married home.  (Video, Disc 1, Part 1, at 2:45.)

After Deputy Blue and Mr. Lewis approached the car, Plaintiff stated that she was going to let Mr. Lewis take the car, and that Deputy Blue could not allow Mr. Lewis on her property.  (Doc. # 46, Ex. 10, at 7 ("Video Tr.").)  Plaintiff argued with Deputy Blue about whether Mr. Lewis and he could be on her property.  (Video Tr. 7.)  Deputy Blue told Plaintiff that they both had a right to be there, and that they needed to figure out how to retrieve the car.  (Video Tr. 7-8.)  Deputy Blue also told Plaintiff, "All right.  Keep it up, you're going to jail, okay?"  (Video Tr. 7.)  Plaintiff continued cursing about her husband's behavior and told the officer that they were not married.  (Pl. Dep. 120, 136; Video Tr. 8.)

Following that exchange, Plaintiff told Deputy Blue that she was going to give them the ignition key to get the car started.  (Pl Dep. 121, Video, Disc 1, Part 1, at 4:10.)  While Plaintiff continued to curse at Mr. Lewis, he unsuccessfully attempted to start the car.

(Video, Disc 1, Part 1, at 4:20.)  Mr. Lewis accused Plaintiff of doing something to keep the car from starting.  (Video, Disc 1, Part 1, at 5:40.)  Plaintiff explained that she had not done anything other than to check the battery, and that she did not know what was wrong with the car.  (Video, Disc 1, Part 1, at 5:50.)   Plaintiff and Mr. Lewis continued to argue about the other woman, until Deputy Blue asked them, "What are we going to do with the car situation?"  (Video Tr. 16.)  Plaintiff also told Mr. Lewis she was keeping the truck because she had to go to the doctor.  (Video, Disc 1, Part 1, at 7:00.)

After further argument, Mr. Lewis asked if he could get his old work shoes so that he could go to work.  (Video Tr. 20.)  Plaintiff told Mr. Lewis that she was not going into the house to get his shoes while Deputy Blue and he were in her yard.  (Video Tr. 20; Video, Disc 1, Part 1, at 9:07.)  Following further argument, Mr. Lewis attempted to start the car again, but those attempts failed.  (Video, Disc 1, Part 1, at 10:10; Video, Disc 1, Part 2, at 2:05.) Mr. Lewis said he would have to come back to get the car, but Plaintiff refused to give Mr. Lewis the door key to the car.  (Video, Disc 1, Part 2, at 1:00; Video, Disc 1, Part 2, at 2:50.)  Deputy Blue and Mr. Lewis then worked under the hood of the car.  (Video, Disc 1, Part 2, at 3:30-4:45.)

### 3. *Mr. Lewis and Deputy Blue Go to the Backyard to Find Mr. Lewis's Shoes*

After further argument with Plaintiff and work on the car, Mr. Lewis said that he needed his work shoes to go to work.  (Video, Disc 1, Part 2, at 6:05.)  Plaintiff told Mr. Lewis that his work shoes were on the back porch of the house.  (Video, Disc 1, Part 2, at 6:10.)  Mr. Lewis asked if he could go get his shoes from the back porch, but Plaintiff told

him he could not, and that she would go get them "when [she] g[o]t ready." (Video Tr. 33; Video, Disc 1, Part 2, at 6:16.) Deputy Blue then said, "They're on the back porch? Come on. Come on with me," to Mr. Lewis, and they can be seen walking off the video screen toward the backyard. (Video Tr. 33; Video, Disc 1, Part 2, at 6:20.)

After entering the backyard, Plaintiff told Deputy Blue and Mr. Lewis, "Don't come back in my backyard any God damn (inaudible)." (Video Tr. 33.) Deputy Blue and Plaintiff then argued about whether or not he could be in her backyard, whether she was going to get the shoes for Mr. Lewis, what time Mr. Lewis needed to be to work, and what shoes Mr. Lewis could wear to work. (Video Tr. 33-35.) The shoes on the back porch were Plaintiff's son's shoes, not Mr. Lewis's. (L. Lewis Dep. 70-71.) Mr. Lewis then asked for a pair of his new shoes from in the house, to which Plaintiff said, "What you got on?" (Video Tr. 35.) Mr. Lewis replied, "I can't go to work in flip-flops." (Video Tr. 35.)

Plaintiff then saw Deputy Blue move away from the house, toward a fence in her backyard. (Pl. Dep. 129.) Around that same time, Deputy Blue made a radio call to the Sheriff's Office to report the situation. (Video Tr. 35-37.) Deputy Blue described the situation to Sheriff Hardin, who told him that if Plaintiff was causing a scene, one of his options would be to charge her with disorderly conduct. (Blue Dep. 33-34.) While Deputy Blue was making his radio call, Plaintiff and Mr. Lewis continued to argue, the details of which are mostly inaudible on the video due to Deputy Blue talking on the radio. (Video, Disc 1, Part 2, at 7:45-9:00.) At some point, Plaintiff told Mr. Lewis that "you ought to let the courts and the lawyers handle this situation. You don't need to try to do it like this here."

(Pl. Dep. 128.)  Following that argument, Plaintiff left the back porch and went back inside the house.  (Pl. Dep. 128.)  After the argument ended in the backyard, Deputy Blue and Mr. Lewis can be seen walking back up to the car in the driveway, where they continued to talk. (Video, Disc 1, Part 1, at 9:25.)

While Deputy Blue and Mr. Lewis talked at the hood of the car, Plaintiff came back out to the front porch of the house.  (Pl. Dep. 131.)  She had come back outside to ask Mr. Lewis what shoes he wanted, and she was wiping her hands with a piece of tissue.  (Pl. Dep. 131.)  Deputy Blue then told Mr. Lewis, "Alright, hang on," and can be seen exiting the video frame, heading toward the front porch of the house.  (Video, Disc 1, Part 2, at 9:53; Video Tr. 38.)  Deputy Blue then asked Mr. Lewis, "Do you have any clothes here, personal property?" (Video Tr. 38; Video Disc 1, Part 2, at 9:56.)  Mr. Lewis's answer is not clearly audible, but he can be seen nodding his head in an up and down manner.  (Video Tr. 38 (Mr. Lewis: "(inaudible) personal property"); Video Disc 1, Part 2, at 9:58 (Disc 1 ends at 9:59).)

### 4.  *Plaintiff Is Arrested*

After his conversation with Mr. Lewis at the car, Deputy Blue hurriedly approached the front porch of Plaintiff's house.[9]  (Pl. Dep. 137-38.)  As Deputy Blue rounded the corner of the front porch, Plaintiff said to him, "Now what you want? What you want?"[10]  (Pl. Dep

---

[9] In her response to Defendant's motion for summary judgment, Plaintiff claims that Deputy Blue "charged her" while she was on the porch.  (Doc. # 46, at 4.)  None of the citations relied upon by Plaintiff support such a factual conclusion.  The audio recording likewise provides no evidence that Deputy Blue was running, sprinting or "charging."

[10] The events that occurred on the front porch, and the sequence in which they occurred, are hotly contested by the parties and the witnesses.  Plaintiff's facts, based almost entirely on her deposition and

138; Video Tr. 38; Video, Disc 2, at 00:00.)   While Plaintiff is heard making those statements, Deputy Blue can be heard walking up the steps to the front porch.  (Video, Disc 2, 00:03.)  According to Plaintiff, Deputy Blue then reached out and grabbed Plaintiff's left arm.  (Pl. Dep. 138-41.)  Plaintiff pulled her arm back and attempted to "back up off him," because she did not know what Deputy Blue was doing.[11]  (Pl. Dep. 138-40, 142.)  According to Plaintiff, Deputy Blue then grabbed her left arm again, bent it behind her back, and bent Plaintiff over at the waist.  (Pl. Dep. 143.)   After he had her left arm behind her back, Plaintiff claims that Deputy Blue told her that she was under arrest.  (Pl. Dep. 143-44; Video Tr. 38; Video, Disc 2, at 00:05.)  Plaintiff's contention – that Deputy Blue told her she was under arrest only *after* he attempted to grab her arm, she tried to "back up off of him," he grabbed her arm again, twisted it behind her back, and bent her over at the waist – is plainly contradicted by the audio as to timing.[12]  Instead, the court credits the audio for the fact that Deputy Blue walked up the steps to the porch, first announced that Plaintiff was under arrest,

---

recollection of the events, have been credited to the extent that they are not so plainly contradicted by the audio from the dashboard camera and the record that no reasonable jury could believe them.  *See Scott*, 550 U.S. at 380-81; *see also supra*, note 8.

[11] Following her arrest, Plaintiff said to Deputy Blue, "Sir, I am not violent or anything.  You just grabbed me the wrong way.  I was trying to get away from you.  (inaudible) my neck."  (Video Tr. 50.)

[12] On the video, the following audio can be clearly heard:  Deputy Blue walks up the steps of the front porch (00:03), Deputy Blue tells Plaintiff, "Alright, listen.  You're under arrest, okay."  (00:04-00:05), Plaintiff responds "For what?" (00:05), and then a series of loud noises consistent with a struggle follow (00:06).  Plaintiff's version of her arrest on the porch, at least her recollection of the events that occurred *before* Deputy Blue told her she was under arrest, are plainly contradicted by the audio from Deputy Blue's microphone.  The audio of the events likewise is consistent with the third party witness statement taken that day from Ms. Toles.  (Doc. # 44, Ex. I ("She was cursing and being very nasty[,] finally the officer told her she was under arrest.  She got mad.  The officer tried to put her in handcuffs[,] but she pushed him away.")).  *See Scott v. Harris*, 550 U.S. at 380-81.

she responded "For what?", and a struggle then ensued.  (Video, Disc 2, 00:03-00:06.)

Plaintiff's account of what occurred during the ensuing struggle is otherwise credited.

After Deputy Blue had Plaintiff's left hand behind her back, he placed a handcuff on

her left hand, and got her right hand behind her back as well.  (Pl. Dep. 148-49.)  During the

struggle, Plaintiff recounts that Deputy Blue "was trying to flip [her] by [her] neck."  (Pl.

Dep. 144-45; Video, Disc 2, at 00:06.)  Plaintiff screamed, "Stop it. Stop it.  I just had

surgery.  Stop.  I just had surgery.  Stop.  What am I under arrest for? (inaudible) Stop."

(Video Tr. 38; Video, Disc 2, at 00:09.)  Plaintiff described the situation, "I don't know if he

was trying to throw me across his shoulder or was he just trying to roll me over his hip.  I

don't know what he was doing."[13]  (Pl. Dep. 151.)  Plaintiff further said, "I guess he was

trying to get me to the floor, I don't know.  He thought I was resisting him when I wasn't."

(Pl. Dep. 154.)  Plaintiff did not go to the floor, however, so Deputy Blue warned Plaintiff,

"All right.  You're fixing to get tased.  (inaudible)"  (Video Tr. 38-39; Video, Part 2, at

00:15.)  At this point, Plaintiff was not fighting Deputy Blue, was frightened, and again

called out, "Stop. Stop. I just had surgery.  Stop.  I just had surgery.  Stop.  Oh! Oh!"  (Pl.

Dep. 145; Video Tr. 39; Video, Disc 2, at 00:17.)  Shortly thereafter, Mr. Lewis said to

Deputy Blue, "She just had surgery, Officer."  (Video Tr. 39; Video, Disc 2, at 00:25.)

Deputy Blue can be heard to respond, "Well she's gonna cooperate, ok, that's what's going

to happen."  (Video, Disc 2, at 00:28.)  Plaintiff can then be heard yelling "I (inaudible) my

_____

[13] The court notes that Plaintiff demonstrated at her deposition what Deputy Blue did to her.  (Pl.
Dep. 151-52.)  Unfortunately, the court is unable to describe this demonstration based on the deposition
transcript.

back out, my back out again. . . . He done pull me out.  He done pull me out."  (Video. Tr. 39; Video, Disc 2, at 00:30.)

After Deputy Blue had her left arm behind her back, Plaintiff said that she gave herself up to him.  (Pl. Dep. 157.)  She also recounted that, "After everybody [Plaintiff and Mr. Lewis] told him, stop, stop, he stopped.  He put the cuffs on my hands."  (Pl. Dep. 157.) Plaintiff later said that "[she] wasn't giving him any resistance whatsoever."  (Pl. Dep. 158.) After Plaintiff's hands were cuffed behind her back, Deputy Blue snatched her down the steps by the handcuffs.  (Pl. Dep. 158-60.)  Deputy Blue pulled her by her handcuffs, "practically dragging [her]" to the Sheriff's SUV.[14]  (Pl. Dep. 160.)  Despite Deputy Blue pulling her by her handcuffs, Plaintiff did not fall.  (Pl. Dep. 166.)  Once at the truck, Deputy Blue asked Plaintiff to back her way up into the backseat of the SUV, but Plaintiff's height, five feet three inches, prevented her from doing so.[15]  (Pl. Dep. 167.)

Around that same time, Plaintiff began to tell Deputy Blue that her neck was out and that he needed to call 911 to get her medical care.  (Video Tr. 43; Pl. Dep. 168.)  Plaintiff was also feeling numbness in her right leg, and continued to tell Deputy Blue that she had just had surgery.  (Pl. Dep. 169; Video Tr. 41-44.)  Either Mr. Lewis or Deputy Blue then got Plaintiff a chair, and she sat down next to the SUV.  (Pl. Dep. 169; Video Tr. 46-48; Video, Disc 2,

---

[14] On the video, Deputy Blue can be heard telling Plaintiff, "You can walk with me, or you [sic], or I'm gonna pull you."  (Video, Disc 2, at 00:56.)

[15] Plaintiff claims that "[Deputy] Blue tried to force Plaintiff, who had just recently had neck surgery, into his patrol vehicle."  (Doc. # 46, at 6-7.)  The evidence cited by Plaintiff does not support the assertion that Deputy Blue tried to force Plaintiff into the Sheriff's SUV.

at 4:10-4:30.)  At this point, Plaintiff was bleeding from the middle finger of her left hand, which had been broken during her arrest.  (Pl. Dep. 170-71, 174-75; Doc # 46, Ex. 12.) Deputy Pearl Carter and Deputy Thomas Hallford then arrived on the scene to provide a car instead of an SUV to carry Plaintiff to jail.  (Blue Dep. 18; Video, Disc 2, at 8:57 (Deputy Blue can be heard talking to the arriving officers).)  Deputy Blue then advised the arriving officers, "Let's get her in a – she's had surgery on her neck, so we got to be careful with her. We've got to get her in the back of the car.  And once we get her to jail, we're gonna get rescue to come check her."  (Video Tr. 58; Video, Disc 2, at 8:57.)  Deputy Carter removed Plaintiff's handcuffs from behind her back and cuffed Plaintiff's hands in front of her body, which Deputy Blue had refused to do.  (Pl. Dep. 173-74.)

Plaintiff told the deputies that she needed a doctor, and Deputy Carter said that Plaintiff had to go to the jail first.  (Pl. Dep. 178.)  While Plaintiff was still seated on the chair, she asked Mr. Lewis to lock up the house for her.  (Pl. Dep. 232-34.)  In order for Mr. Lewis to do so, Deputy Carter got Plaintiff's keys out of her pocket, gave them to Deputy Hallford, who then gave them to Mr. Lewis.  (Pl. Dep. 233.)  Deputies Carter and Hallford then put Plaintiff in the back seat of a Sheriff's Department car.  (Pl. Dep. 178-80.)  In order to get Plaintiff into the Sheriff's car, one Deputy had to go around the car and pull her from the other side, while the other Deputy pushed her in.  (Pl. Dep. 179.)

### 5.   *Deputy Blue Enters Plaintiff's Home*

Before Deputy Carter drove Plaintiff to the jail, Plaintiff saw Deputy Blue, Deputy Hallford, and Mr. Lewis standing on the front porch of her home.  (Pl. Dep. 231.)  Plaintiff

then saw Mr. Lewis enter the home, followed by Deputy Blue, while Deputy Hallford stayed on the front porch.[16]  (Pl. Dep. 232.)  The record is silent as to whether Plaintiff registered a complaint when she observed her husband and Deputy Blue entering the residence.  Mr. Lewis asked the Deputies to come into the house with him so that Plaintiff would not say that he stole something or took something from the home.  (L. Lewis Dep. 94.)  Deputy Blue did not ask for or receive Plaintiff's consent to enter the house.  (Blue Dep. 77.)  According to Mr. Lewis, Deputy Blue and Deputy Carter then entered the house with him.  (L. Lewis Dep. 95.)  Once inside the house, Mr. Lewis retrieved his key ring with his keys to the house and truck, and an old pair of work shoes.  (L. Lewis Dep. 96, 105-06)  Deputy Blue sat down on the couch in the residence, and neither Deputy went beyond the living room of the home.[17] (L. Lewis Dep. 95, 105.)  While Deputy Blue was in the living room, he saw a pistol that was sitting on a table in the living room, cleared it, and took possession of it.[18]  (L. Lewis Dep. 105; Blue Dep. 75-76.)   After Mr. Lewis retrieved his things, he and the Deputies exited the house, and Mr. Lewis locked it.  (L. Lewis Dep. 105-06.)  Mr. Lewis then drove to the jail to pick up his wife, who had been transported in the meantime.  (L. Lewis Dep. 105-06.)

_____

[16] Plaintiff remembered Deputy Hallford and Deputy Blue staying at the house, while Deputy Carter drove her to the jail.  (Pl. Dep 231-32.)  Mr. Lewis and Deputy Blue remembered Deputy Carter and Deputy Blue staying at the house, while Deputy Hallford drove Plaintiff to the station.  (L. Lewis Dep. 94-95; Blue Dep. 74.) Plaintiff's recollection has been credited for what she saw from the vehicle, but the factual dispute is inconsequential to this motion.

[17] The front door of the home opens into the living room.  (Blue Dep. 75.)

[18] The pistol was returned to Plaintiff by Sheriff Harden two or three weeks after her arrest.  (Pl. Dep. 229.)

### 6.    *Plaintiff's Medical Treatment*

Deputy Carter drove Plaintiff to the jail, where she was transferred to an ambulance and taken to Stabler Hospital.  (Pl. Dep. 180-82.)  At the hospital, Plaintiff received X-rays and CAT scans on her neck and finger.  (Pl. Dep. 183-85.)  The doctors then braced her neck and finger, and told her that she needed to see her doctor as soon as possible.  (Pl. Dep. 186.)  Following her treatment at the hospital, Deputies Blue and Carter took Plaintiff to the jail to complete the booking process.  (Pl. Dep. 190-91.)  The remainder of Plaintiff's processing by the Butler County Sheriff's Department is not pertinent to this motion.

## D.    Plaintiff's Injuries

On August 11, 2008, Plaintiff was scheduled to go to Dr. John Hackman's office to see if he would release her to go back to work following her May, 2008 neck surgery.[19]  (Pl. Dep. 69-70; 240-41.)  Plaintiff did not attend that appointment because of her arrest.  (Pl. Dep. 240-41.)  Plaintiff visited Dr. Hackman again after her arrest, and he found that her arrest by Deputy Blue could have exacerbated her pre-existing problems with her neck, back, and hip.  (Hackman Dep. 64-66 (Doc. # 46, Ex. 4).)  After that, Plaintiff continued to be in pain from her neck, hip, and back injuries.  (Pl. Dep. 250.)  Finally, Plaintiff was scheduled to return to work around August 20 or 21, 2008, but was unable to return to work by that date following her injuries.  (Pl. Dep. 234-36.)  As a result, Plaintiff lost her employment.  (Pl. Dep. 235.)

---

[19] Following her May 2008 neck surgery, Plaintiff did not return to work.  (Pl. Dep. 235-36.)  She was scheduled to be off work for twelve weeks following her surgery.  (Pl. Dep. 236.)

### E.   Plaintiff's Claims

Previously, the court granted in part and denied in part Deputy Blue's Motion to Dismiss.  (Doc. # 22.)  Plaintiff's remaining claims are (1) that her arrest was unlawful under the Fourth Amendment and thus any force he used was excessive (Count III),[20] (2) that Deputy Blue used excessive force during her arrest which proximately caused her neck, back, leg, and finger injuries (Count III), and (3) that Deputy Blue performed an unlawful search and seizure of her home in violation of the Fourth Amendment (Count II).  (Am. Compl.) Plaintiff seeks $1,000,000 in compensatory damages, $1,000,000 in punitive damages, her costs and attorney's fees, and all equitable relief within the jurisdiction of the court.  (Am. Compl. 19-20.)

## V.  DISCUSSION

To establish § 1983 individual liability, Plaintiff must demonstrate that (1) she was deprived of a right secured by the United States Constitution, and (2) the act or omission

---

[20] Though Plaintiff titled her claim arising from her arrest as one for "excessive force," she also alleged that Deputy Blue's use of force was necessarily unreasonable because he lacked probable cause to arrest her.  (Mot. to Dismiss Op. 11.)  Therefore, Plaintiff actually alleged and presented evidence of two separate constitutional violations:  (1) that Deputy Blue did not have probable cause to arrest her and therefore her arrest was unlawful, and (2) that Deputy Blue used excessive force in effecting her arrest. *See, e.g., Williams v. Sirmons*, 307 F. App'x 354, 357-58 (11th Cir. 2009).  An excessive force claim is discrete from an unlawful arrest claim because "'[u]nder this Circuit's law . . . a claim that any force [used] in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim.'"  *Id.* (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (discussing the *Williamson* rule:  *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995))).  "An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest."  *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).  Stated another way, "*an excessive force claim* presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and *is independent of whether law enforcement has the power to arrest.*"  *Id.* (emphasis added).

causing the deprivation was committed by an individual acting under color of state law. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987). Deputy Blue raises the defense of qualified immunity as to the constitutional claims asserted by Plaintiff against him in his individual capacity. (Doc. # 44, at 25.) "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages" unless they have violated a clearly established constitutional right. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010) (citation and internal quotation marks omitted). A qualified immunity determination requires the application of a multi-part test. First, a defendant must establish that he or she was acting within his or her discretionary authority as a public employee when the conduct in question occurred. *Id.* at 1158. Next, a plaintiff must demonstrate "'that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.'" *Id.* (quoting *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).

In previous years, this two-step inquiry had to be conducted in order. That is, the court had to decide whether a right existed (and whether it was violated) before deciding whether it was clearly established. Now, courts may "'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Id.* (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)).

It is undisputed that Deputy Blue was acting within his discretionary authority. (Doc. # 46, at 12.) Thus, the burden shifts to Plaintiff to show that Deputy Blue is deprived of qualified immunity based on his actions. In Part V.A, the court addresses whether it was

clearly established that Deputy Blue's arrest of Plaintiff was unlawful.  In Part V.B,  the court addresses whether the excessive force right claimed by Plaintiff was clearly established at the time of her arrest.  In Part V.C, the court analyzes whether Deputy Blue's entry into her home and seizure of her pistol violated the Fourth Amendment.

**A.**     **Fourth Amendment Unlawful Arrest (Count III)**

Plaintiff argues that Deputy Blue lacked probable cause to arrest her for disorderly conduct on August 11, 2008.  (Doc. # 46, at 14.)  As a result, Plaintiff claims that because "[n]one of the conduct on the part of Plaintiff constituted disorderly conduct . . . her arrest was unlawful, as were all other subsequent actions taken by [Deputy] Blue."  (Doc. # 46, at 14 (also stating that "the force used by Blue during Plaintiff's arrest was excessive as she had committed and was suspected of no crime").)  Defendant contends he is due qualified immunity because there was arguable probable cause to arrest Plaintiff for disorderly conduct.

Analysis begins with background on an unlawful arrest claim under the Fourth Amendment, then turns to the law governing qualified immunity on an unlawful arrest claim, and concludes with a discussion of whether Deputy Blue is due qualified immunity.  Because there was arguable probable cause to arrest Plaintiff for disorderly conduct, Deputy Blue is due qualified immunity on Plaintiff's unlawful arrest claim.

**1.**     *Unlawful Arrest Under the Fourth Amendment*

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."  *Madiwale v. Savaiko*, 117 F.3d 1321, 1324

(11th Cir. 1997) (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).  "[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making the arrest."  *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).  Likewise, "the damages recoverable on an unlawful arrest claim 'include the damages suffered because of the use of force in effecting the arrest.'"  *Id.* (citing *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)).

"Probable cause exists if the facts and the circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."  *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted).  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  *Adams v. Williams*, 407 U.S. 143, 149 (1972).

## 2.    *Qualified Immunity and Unlawful Arrest*

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity."  *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).  For qualified immunity from a claim of unlawful arrest, an officer need not have actual probable cause, but only arguable probable cause.  *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003).  Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed to arrest [the]

[p]laintiff." *Kingsland v. City of Miami, Fla.*, 382 F.3d 1220, 1232 (11th Cir. 2004) (citing *Von Stein*, 904 F.2d at 579). The plaintiff bears the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." *Id.* Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Holmes*, 321 F.3d at 1079 (internal quotations marks and citations omitted).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. *Skop*, 485 F.3d at 1137-38. Arguable probable cause does not, however, require an arresting officer to prove every element of a crime before making an arrest, because such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1303 (11th Cir. 2001). Thus, the inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable cause determination and not whether the arrestee's actions actually constituted a crime." *Id.* at 1303 n.8.

On the offense of disorderly conduct,[21] Alabama Code § 13A-11-7 provides in pertinent part:[22]

---

[21] Under Alabama Code § 15-10-3(a)(1), "An officer may arrest a person without a warrant, on any day and at any time . . . [i]f a public offense has been committed or a breach of peace threatened in the presence of a police officer."

[22] Because Plaintiff's resisting arrest charge arose after her initial arrest for disorderly conduct, the analysis focuses only on whether there was arguable probable cause for the initial disorderly conduct arrest.

(a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [s]he:

> (1) Engages in fighting or in violent tumultuous or threatening behavior; or
>
> (2) Makes unreasonable noise; or
>
> (3) In a public place uses abusive or obscene language or makes an obscene gesture . . . .

Plaintiff argues that Deputy Blue lacked probable cause to arrest her for disorderly conduct because, as Deputy Blue described it shortly after the arrest, she was "running [her] mouth."[23] (Doc. # 46, at 13; Video Tr. 40.) Plaintiff then argues that using "coarse, crude, or distasteful" language alone is insufficient for a violation of the disorderly conduct statute, unless the words are used in a manner constituting "fighting words." (Doc. # 46, at 13 (citing *Cohen v. California*, 403 U.S. 15 (1971).) Because Plaintiff's words only involved profanity and did not rise to the level of fighting words, Plaintiff argues that Deputy Blue lacked probable cause for a disorderly conduct arrest. As evidence that Plaintiff did not use fighting words, Plaintiff points to the fact that Mr. Lewis remained calm despite the profanity directed at him that day. (Doc. # 46, at 14.)

Deputy Blue argues that Plaintiff's words and conduct created arguable probable cause under prongs (1), (2), or (3) of the Alabama disorderly conduct statute. (Doc. # 44, at 29.) First, Deputy Blue argues that a reasonable officer could have perceived Plaintiff's loud cursing as threatening. (Doc. # 44, at 29.) Second, Deputy Blue argues that a reasonable

---

[23] "The validity of an arrest does not turn on the offense announced at the time of the arrest." *Bailey v. Bd. of Cnty. Comm'rs of Alachua, Cnty. Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992) (citing *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973)).

officer could have found Plaintiff's loud and profane behavior created arguable probable cause under prong (2) or (3) of the disorderly conduct statute.  (Doc. # 44, at 29.)  Third, Deputy Blue argues that arguable probable cause is supported by Plaintiff's failure to give Mr. Lewis the personal property he needed to go to work and Mr. Lewis and Deputy Blue's suspicion that Plaintiff had damaged the car.  (Doc. # 52, at 8.)  Finally, Deputy Blue argues that because Sheriff Harden, the Butler County District Attorney, and a grand jury each found that probable cause existed to charge Plaintiff with disorderly conduct, it follows that Deputy Blue at least had arguable probable cause for such an arrest.  (Doc. # 52, at 7-8.)

With these arguments in mind, the court now turns to the arguable probable cause analysis.

### 3. Whether Deputy Blue Had Arguable Probable Cause to Arrest Plaintiff for Disorderly Conduct

A reasonable officer in Deputy Blue's position could have believed that Plaintiff was "recklessly creating a risk" of "public annoyance" by "making unreasonable noise."  Though Plaintiff was on private property, she admits that she was being loud as she subjected Mr. Lewis to profane language that could also be heard on the street, by neighbors, and by

anybody passing by.[24]  The fact that Plaintiff's loud and profane language could be heard

from the street is confirmed by Plaintiff's admission and Ms. Toles's statement.  *(See* Doc.

# 44, Ex. I (Tameka Toles said after the arrest, "She was cursing and being very nasty[,]

finally the officer told her she was under arrest."); L. Lewis Dep. 54, 61 (Ms. Toles was in

the SUV during the incident); Pl. Dep. 98 (Ms. Toles was parked on the "highway."); Pl.

Dep. 135 (In her deposition, Plaintiff admitted she was loud and that her neighbors could

hear anything said in her yard "because the acoustics [in her neighborhood are] really

good.").)

Plaintiff's loud and profane language provided arguable probable cause for a

disorderly conduct arrest.[25]  *See Rose v. Town of Jackson's Gap*, 952 F. Supp. 757, 764

(M.D. Ala. 1996) (finding that an officer had arguable probable cause for a disorderly

conduct arrest of a suspect who was arguing loudly on private property during a domestic

---

[24] Plaintiff's facts show that Plaintiff used loud (Pl. Dep. 135) and vulgar language directed at both Mr. Lewis and Deputy Blue: (1) Deputy Blue: "All right.  Keep it up, you're going to jail, okay?" Plaintiff: "I don't give a damn." (Video Tr. 7); (2) Plaintiff: "That bastard [Mr. Lewis] ain't married to me." (Video Tr. 8); (3) Plaintiff called Mr. Lewis a "no good bastard" (Video Tr. 8); (4) After being accused of tampering with the car, Plaintiff said, "I ain't did shit to it" and "I ain't did shit to this car." (Video Tr. 13, 25); (5) Plaintiff said to Mr. Lewis, "You want to come on the property, so I told you, you ain't getting a damn thing."  (Video Tr. 21); (6) Plaintiff told Mr. Lewis, "If I catch that bitch in this car, I'm gonna – I'm taking the car back, too.  You can believe that" (Video Tr. 30); and (7) Plaintiff to Mr. Lewis and Deputy Blue, "Don't come back in my backyard any God damn (inaudible)."  (Video Tr. 33.)

[25] The Alabama disorderly conduct statute is "designed to protect the public from being annoyed, inconvenienced, or alarmed."  Ala. Code § 13A-11-7 (commentary).  To violate the disorderly conduct statute, the offender must "intend to cause public inconvenience, annoyance, or alarm, or . . . recklessly create[] a risk thereof."  *Smith v. City of Anniston*, 668 So. 2d 96, 98 (Ala. Crim. App. 1995) *cert. denied*, Case No. 1941282 (Ala. Aug. 11, 1995).  "Because intent is inherently difficult to prove by direct evidence, its existence may be evinced by the words and actions of the accused and may be inferred from all the facts and circumstances in the case."  *Hinds v. State*, 423 So. 2d 1382, 1388 (Ala. Crim. App. 1982).

dispute and could have created public inconvenience, annoyance, or alarm for neighbors or passers-by); *Ivey v. State*, 710 So. 2d 946, 947 (Ala. Crim. App. 1998) (upholding a defendant's *conviction* for disorderly conduct where he had yelled abusive language at his next-door neighbor); *Smith v. City of Anniston*, 668 So. 2d 96, 98 (Ala. Crim. App. 1995) (upholding a defendant's *conviction* for disorderly conduct where he had yelled offensive language in a loud voice that could be heard by others, even though the defendant was on private property); *Powell v. State*, 796 So. 2d 404, 424-25 (Ala. Crim. App. 1999) (finding that officers had probable cause to arrest suspect for disorderly conduct where suspect had cursed loudly and used abusive language in the presence of several police officers in a hallway of a police station); *cf. Walker v. Briley*, 140 F. Supp. 2d 1249, 1258 (N.D. Ala. 2001) (finding no arguable probable cause for a disorderly conduct arrest where the plaintiff's evidence showed that the plaintiff had not been loud, used profanity, or used a belligerent tone in voicing his displeasure to two police officers who had pulled him over).

Plaintiff's fighting words argument is unavailing because it was not merely the content of Plaintiff's words that provided arguable probable cause, *see* § 13A-11-7(a)(3), but also the fact that she was being loud and could be heard from the street. § 13A-11-7(a)(2); *Hutchins v. City of Alexander City*, 822 So. 2d 459, 461-62 (Ala. Crim. App. 2000) (rejecting a defendant's First Amendment challenge to the unreasonable noise prong of the disorderly conduct statute and affirming a defendant's disorderly conduct conviction for screaming in a police station); *Sterling v. State*, 701 So. 2d 71 (Ala. Crim. App. 1997) (finding that the unreasonable noise prong of the disorderly conduct statute is not constitutionally overbroad

27

and that defendant's First Amendment rights were not violated where he was convicted of disorderly conduct for speaking loudly in a courthouse hallway).  It need not be decided whether there is sufficient evidence to support a conviction of Plaintiff for disorderly conduct.  Rather, it is enough that Plaintiff has failed to demonstrate that no reasonable officer could have found probable cause to arrest Plaintiff for disorderly conduct.[26]  Thus, Deputy Blue is entitled to qualified immunity on the unlawful arrest claim.

**B.**     **Fourth Amendment Excessive Force (Count III)**

The court now turns to Plaintiff's separate claim that the quantum of force used by Deputy Blue to effect her arrest was excessive and thus, in violation of the Fourth Amendment.  Deputy Blue likewise asserts qualified immunity on this claim.

Analysis begins with background on an excessive force claim under the Fourth Amendment, then turns to the law governing the "clearly established right" prong of qualified immunity on an excessive force claim, and concludes with a discussion of whether Deputy Blue is due qualified immunity under that prong.  Because this is not a case far

---

[26] Though Plaintiff did not address it in her brief, this case is distinguishable from *Thornton v. City of Macon, Ga.*, 132 F.3d 1395 (11th Cir. 1998).  There, the court found that the defendant officers lacked arguable probable cause to arrest the plaintiff for obstruction of a law enforcement officer under Georgia law because the officers lacked the authority to force a former co-tenant to return a mattress to the complaining former co-tenant.  *Id.* at 1399-1400.  *Thornton* is distinguishable from this case on at least two grounds:  (1) the plaintiff was charged with obstruction, not disorderly conduct, based on his failure to comply with the officers' demands which the officers lacked lawful authority to make in settling a civil dispute between former co-tenants; and (2) in distinguishing a Georgia case, the court noted that when the parties are married and the officers escort a spouse back onto the property, the fact that the wife had the same right to be present on the property as the husband weighed in favor of finding that the officers were acting within their official authority.  *Id.* at 1399.

beyond the hazy border between excessive and acceptable force, Deputy Blue is due qualified immunity on Plaintiff's excessive force claim.

### 1.   *Excessive Force Under the Fourth Amendment*

The Fourth Amendment's "objective reasonableness" standard governs whether a use of force is excessive.  *Hadley v. Gutierrez*,  526 F.3d 1324, 1329 (11th Cir. 2008); *see also Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).  The reasonableness inquiry requires the court to "carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake.'" *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

First, to determine whether the force applied was reasonable, the court looks "at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).  The quantum of force used should be measured against "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*; *see also Oliver*, 586 F.3d at 905.

Second, the court also considers "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, [and] (3) the extent of the injury inflicted."  *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986), *abrogated in part by*

29

*Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (recognizing that *Leslie*'s fourth factor, the subjective inquiry into the officer's motive, was invalidated by *Graham*)); *see also Lee*, 284 F.3d at 1198 n.7 (discussing the continuing validity of the other three *Leslie* factors). However, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.

Third, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* Hence, "[u]se of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, [instead of] with the 20/20 vision of hindsight." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

Finally, in conducting the reasonableness inquiry based on Plaintiff's facts, the Eleventh Circuit has recognized that an officer's use of force is more likely to be unlawful when it occurs "after the arrest [has] been fully effected, the arrestee completely secured, and all danger vitiated." *Lee*, 284 F.3d at 1199-1200.

## 2.    The "Clearly Established Right" Prong of Qualified Immunity and Excessive Force

In order to overcome qualified immunity, Plaintiff must demonstrate that as of August 11, 2008, the law was clearly established that the force used by Deputy Blue was excessive. Plaintiff argues that "[i]t is clearly established law that twisting Plaintiff's arm and hand behind her head and back resulting in a bleeding finger, a broken finger, and forcing her by pushing and pulling, while having knowledge that she was recovering from neck surgery, into a vehicle as she repeatedly warned officers that her leg was numb and that she was in pain is excessive force under the circumstances."  (Doc. # 46, at 13.) For the reasons that follow, Plaintiff's argument is insufficient to overcome Deputy Blue's qualified immunity.

Plaintiff has not cited any "materially similar case [that has] already decided that what the police officer was doing was unlawful." *Lee*, 284 F.3d at 1198 (internal quotation marks omitted).  Thus, Plaintiff must show that Deputy Blue's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* at 1199 (citing *Priester v. City of Riviera Beach, Fla*, 208 F.3d 919, 926 (11th Cir. 2000)).  "Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude that the force was unlawful." *Id.* (internal quotation marks and citations omitted).  Stated another way, the peculiar facts of this case must be "so far beyond the hazy border between excessive and acceptable force [that every reasonable

31

officer] had to know he was violating the Constitution without caselaw on point." *Vinyard*, 311 F.3d at 1355.

### 3.  Whether Deputy Blue Violated Plaintiff's Clearly Established Right to be Free from Excessive Force

A review of *Leslie*, *Graham*, and Eleventh Circuit case law up to August 2008 shows that this is not a case "far beyond the hazy border between excessive and acceptable force." As a threshold matter, Deputy Blue's initial grab of Plaintiff's arm to effect her arrest for disorderly conduct was plainly an application of lawful, de minimis force.  Disorderly conduct is a misdemeanor under Alabama law that authorizes an officer to make a custodial arrest.  Ala. Code § 13A-11-7.  Not only has Fourth Amendment jurisprudence long recognized that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, but the Eleventh Circuit "has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003)  "In the Eleventh Circuit, [courts] recognize that the typical arrest involves some force and injury." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).  For even minor offenses, police officers are authorized to use physical restraint, handcuffs, and to push suspects. *See Nolin*, 207 F.3d at 1257 (no constitutional violation to grab suspect, push him against a van, search his groin in an uncomfortable manner, and place him in handcuffs); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (no constitutional violation to slam plaintiff against wall, kick

plaintiff's legs apart, and require plaintiff to raise arms above his head); *Gold v. City of Miami*, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (no constitutional violation for affixing handcuffs too tightly on disorderly conduct arrestee); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993) (not excessive force to arrest a plaintiff for building code violation by pushing him against a wall, applying a chokehold, and handcuffing him even though plaintiff was not resisting); *cf. Lee*, 284 F.3d at 1191, 1198 (finding a constitutional violation for the defendant's unreasonable use of force after the plaintiff was arrested and secured, but making no such finding on the defendant's use of force in subduing and securing the plaintiff by pulling her out of her car by her wrist, shoving her against the car, throwing her hands on top of the hood, and then handcuffing her). Likewise, there is no evidence that Deputy Blue's initial grab of Plaintiff's arm caused her any injury at all.

After Deputy Blue announced the arrest and unsuccessfully tried to effectuate the arrest of Plaintiff by grabbing her arm, Plaintiff admits that she pulled her arm back, "backed up off of [him]," and "was trying to get away from [him]." (Pl. Dep. 138-40, 142; Video Tr. 50.) Deputy Blue then continued his efforts to arrest Plaintiff by grabbing her left arm, bending it behind her back, bending her over at the waist, and placing a handcuff on her left hand. At this point, Deputy Blue also attempted to throw her across his shoulder or roll her over his hip, but he did not take Plaintiff to the floor. Deputy Blue then threatened to use his taser against Plaintiff. After these events, Deputy Blue was finally able to handcuff Plaintiff's right hand. After handcuffing Plaintiff, he also pulled her by her handcuffs down the porch stairs and to the waiting vehicle, without causing Plaintiff to fall.

Every reasonable officer in Deputy Blue's position would not inevitably conclude that such use of force was unlawful under the standards of *Leslie* and *Graham*. Deputy Blue's initial attempt to arrest Plaintiff for disorderly conduct failed. Though disorderly conduct is a minor crime under the first *Graham* factor, it still carries with it the license to use physical force to effectuate an arrest. *Graham*, 490 U.S. at 396. That license was enhanced when Plaintiff foiled Deputy Blue's initial attempt to arrest her. By her own admission, Plaintiff was actively resisting Deputy Blue when he initially tried to arrest her.[27] As Deputy Blue approached, the video recounts that she said to him in a quarrelsome tone, "Now what you want. What you want?" After he attempted to apply de minimis force, Plaintiff pulled her arm back and attempted to get away from him. Plaintiff even recognized that Deputy Blue thought that she was resisting him, a conclusion that was objectively reasonable in light of the evidence of Plaintiff's resistance and evasion. (Pl. Dep. 154 ("He thought I was resisting him when I wasn't."); *cf.* Pl. Dep. 140.) Plaintiff's own evidence shows that she was initially a non-compliant suspect who both physically and verbally refused to submit to Deputy Blue's arrest. This verbal and physical resistance weighs heavily in Deputy Blue's favor on the third *Graham* factor, while also marginally increasing the severity of the crime under the first *Graham* factor. In addition, when she verbally and physically resisted arrest, Plaintiff was "standing in front of the front door" of her home (Pl. Dep. 141), a potential escape path

---

[27] Ala. Code § 13A-10-41 (Resisting arrest is a Class B misdemeanor.); *see* Ala. Code § 13A-10-41 Commentary ("Note that it is not necessary that defendant used force or violence in obstructing the officer, only that [s]he engaged in some conduct intending to prevent the officer from effecting a lawful arrest.").

34

that would objectively allow her to evade arrest by retreating into her home, absent some action by Deputy Blue.  On the second *Graham* factor, a reasonable officer on the scene would conclude that Plaintiff posed a threat based on Plaintiff's physical and verbal resistance, her cursing at Deputy Blue and Mr. Lewis, and the likelihood that she could quickly retreat through the front door of the home if not physically restrained.[28]

Based on a balancing of the *Graham* factors with the amount of force Deputy Blue used in effecting Plaintiff's arrest, this is not a case in which every reasonable officer would conclude that Deputy Blue's actions were unlawful.  Plaintiff's argument that the force used by Deputy Blue was gratuitous is unavailing where Plaintiff's evidence demonstrates that she resisted arrest.  *See Hadley*, 526 F.3d at 1330 ("Our cases hold that gratuitous use of force when a criminal suspect *is not resisting arrest* constitutes excessive force.") (emphasis added).  Nor is this a case in which an officer used gratuitous force against a fully secured and subdued arrestee for no legitimate law-enforcement purpose.  *See Lee*, 284 F.3d at 1198 (After plaintiff was arrested and subdued, officer slammed plaintiff's head against the trunk of a car); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (After plaintiff was arrested and subdued, officers repeatedly hit his head on the pavement, kicked him, and knocked him unconscious.).  Nor does the fact that Deputy Blue pulled Plaintiff by her handcuffs out to his vehicle, and away from her home and front door, immediately following

---

[28] The court notes that, though it was unknown to Deputy Blue at the time, Plaintiff had a loaded pistol sitting on the living room table behind the front door.  Though Deputy Blue did not know of this specific threat during the arrest, a reasonable officer on the scene would be aware of the *potential* for such a threat if an intransigent, emotional suspect were allowed to flee inside the home.

her arrest constitute gratuitous force.  *See, e.g., Vinyard*, 311 F.3d at 1344, 1349 n.13 (not excessive force to drag a handcuffed arrestee into the jail "either by her shirt, her arm, or her hair")*; Buckley v. Haddock*, 292 F. App'x 791, 796 (11th Cir. 2008) (recognizing that the previously non-compliant suspect was not secure until placed in the patrol car).

The injuries to Plaintiff's finger, neck, and back during her arrest do not alter the constitutional analysis under the clearly established prong of qualified immunity.  First, as to the Plaintiff's back and neck, "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time."  *Rodriguez*, 280 F.3d at 1353.  There is nothing in evidence to show that Deputy Blue had any knowledge of Plaintiff's previous medical conditions, including multiple back surgeries, before he attempted to arrest her.  Rather, what a reasonable officer would have first recognized upon attempting to arrest Plaintiff was that she had both verbally and physically resisted the officer's efforts to arrest her.  Likewise, Plaintiff had previously lied to Deputy Blue about her marriage to Mr. Lewis and his residence.  (Video Tr. 8 ("That bastard ain't married to me.  And you can't prove it."); *cf.* Pl. Dep. 17 (Q: Are you currently married Ms. Lewis; A: Unfortunately, yes.; Q: How long have you been married?  A: Since 1985).)  It is against that backdrop that a reasonable officer would have perceived and interpreted her pleas to Deputy Blue to "stop" and that "[she] just had surgery."  A reasonable officer in such a situation is not required to credit Plaintiff's verbal complaints about her previous surgery and injuries. "[A] police officer need not credit everything a suspect tells him. . . . This idea is especially

36

true when the officer is in the process of handcuffing a suspect." *Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002) (*denying rehearing en banc*).  Nor does the court find clearly unreasonable Deputy Blue's pulling of the previously fractious Plaintiff to the Sheriff's SUV immediately after handcuffing her simply because Mr. Lewis told Deputy Blue, while he was handcuffing Plaintiff, about her recent surgery.

Finally, Plaintiff's broken finger does nothing to advance her argument that Deputy Blue acted in a manner far outside the hazy border between reasonable and excessive force. Though Plaintiff's broken finger might take this case out of the zone of de minimis force on the constitutional violation prong of qualified immunity, it does not alter the clearly established right inquiry. The context and significance of Plaintiff's broken finger do not demonstrate that it was objectively obvious that Deputy Blue had violated the Constitution. The Eleventh Circuit's analysis in *Smith v. Mattox*, 127 F.3d 1416, 1418 (11th Cir. 1997), makes this abundantly clear.  *Smith* was  "a very close case" that "barely" met the clearly established prong of qualified immunity.  In *Smith*, the plaintiff "barely" made such a showing where an officer, in the process of handcuffing a suspect who had "docilely submitted" and was lying face first on the ground, pulled the suspect's arm back and delivered "a grunt and a blow" to the suspect's arm, fracturing it in multiple places.  *Id.* at 1418-19.  The court held that "[t]he grunt and blow that [plaintiff] asserts that he heard and felt while [the officer] was on [plaintiff's] back, coupled with the severity of [the plaintiff's] injury, push this case over the line . . . [into] the slender category of cases in which the unlawfulness of the conduct is readily apparent even without clarifying caselaw."  *Id.* at

37

1419-20.  In reaching that conclusion, the court focused on the fact that the suspect was offering no resistance at all and "the considerable effort and force inferable from the grunt, [plaintiff's] sensation of a blow, and the broken arm," to find that the plaintiff had made a showing of obvious unreasonableness, albeit just barely.  *Id.* at 1420.

Plaintiff's facts do not raise the same inference of obvious unreasonableness that the court found in *Smith v. Mattox*.  First, Plaintiff did not docilely submit to Deputy Blue as did the plaintiff in *Smith*.  *Id.* at 1420 (Mr. Smith was offering "no resistance *at all*.")  In *Smith*, the plaintiff had fled from the police, then stopped his flight, turned back toward the police, "pretended to run again," and upon being ordered to "get down," did so "docilely" and without incident.  *Id.* at 1418.  Here, Plaintiff initially resisted Deputy Blue's application of de minimis force.  Deputy Blue then, without time to ponder an alternate course, applied more force to effectuate the arrest, additional force not required of the officer in *Smith*.  *See Menuel v. City of Atlanta*, 25 F.3d 990, 996-97 (11th Cir. 1994) ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable.").

Second, Plaintiff has produced no evidence of how her finger was broken during her arrest, just that it was not broken before her arrest, and it was broken afterward.  Thus, she is due no *Smith*-like inference that the broken finger was a result of "considerable effort and force" that was wholly unnecessary to "restrain even a previously fractious arrestee." *Smith*,

127 F.3d at 1420.  Third, Plaintiff's broken finger, though possibly more than a de minimis injury, was a significantly less severe injury than an arm fractured in multiple places.  If *Smith v. Mattox* was a very close case, just barely over the line, Plaintiff's case is not even in the ballpark.

Finally, Plaintiff's argument that Deputy Blue forced Plaintiff into the Sheriff's SUV is unsupported by Plaintiff's own evidence, nor would such de minimis and non-gratuitous force rise anywhere close to obvious unreasonableness.[29]

Deputy Blue is due qualified immunity on Plaintiff's excessive force claim.

## C.      Fourth Amendment Unreasonable Search and Seizure of Plaintiff's Home (Count II)

Plaintiff contends that Deputy Blue's entry into her home and seizure of her pistol violated her Fourth Amendment right to be free of an unlawful search and seizure inside her home.  Deputy Blue's primary argument for qualified immunity stems from the consent exception to the Fourth Amendment.  In her opposition to summary judgment, Plaintiff makes no argument opposing Deputy Blue's entry into the home with Mr. Lewis's consent. Here, application of the consent exception shows that Deputy Blue's entry into Plaintiff's

---

[29] Further, even if Deputy Carter and Deputy Hallford had used excessive force in placing Plaintiff in the Sheriff's car, she would have no claim against Deputy Blue for such use of force.  (Pl. Dep. 179-80), *see, e.g.*, *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (To prevail on the merits in a § 1983 action against a defendant in his individual capacity, the plaintiff is "required to show that [the defendant was] personally involved in acts or omissions that resulted in the constitutional deprivation.").

home did not violate the Fourth Amendment, and thus Deputy Blue is due qualified immunity.

### 1.       *Unlawful Search and Seizure Inside a Home Under the Fourth Amendment*

"It is a fundamental rule of Fourth Amendment law that warrantless searches and seizures inside a home are presumptively invalid." *Bates v. Harvey*, 518 F.3d 1233, 1243 (11th Cir. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).   Here, it is undisputed that Defendants did not have a warrant to enter Plaintiff's property.   Yet, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), there are two principal exceptions to the warrant requirement, for searches conducted by consent or under exigent circumstances.   *Katz v. United States*, 389 U.S. 347, 357 (1967).

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).   "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se, one 'jealously and carefully drawn exception,' recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Id.* at 109 (other internal citations omitted).   In *United States v. Matlock*, 415 U.S. 164 (1974), the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom the authority is

40

shared." *Id.* at 170  In *Matlock*, the Court found that the defendant's wife had common authority over the house she shared with her husband, and that her consent to search the home was valid against her husband who was absent and unable to object because he had just been arrested and was detained in a squad car parked nearby. *Id.* at 166, 171-72.  The Court also held that the concept of common authority over the premises in the consent context was broad and not tethered to property law. *Id.* at 171 n.7.  Rather, the concept was based on "the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right . . . ." *Id.*

In *Randolph*, the Supreme Court stated, "As *Matlock* put it, shared tenancy is understood to include an 'assumption of risk,' on which police officers are entitled to rely . . . ."[30] 547 U.S. at 112.  Likewise, the consent exception also extends to situations where the police receive consent from a supposed co-occupant that the police "reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph*, 547 U.S. at 109 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)).  The *Randolph* court also found that a wife that had been separated from her husband for at least a month and had only recently returned to Americus, Georgia, from Canada was a co-occupant with her husband sufficient for common authority over the home. *Id.* at 114.  Ultimately, the facts and result of *Randolph* were different from those of *Matlock*, "[s]ince the co-tenant wishing to open the

---

[30] As described by *Matlock*, "mutual use of the property by persons generally having joint access or control for most purposes" carries with it an assumption of risk "that one of [his or her co-inhabitants] might permit the common area to be searched."  415 U.S. at 171 n.7.

door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.*

### 2. Whether Deputy Blue Violated a Constitutional Right in Entering Plaintiff's Home

Plaintiff has failed to carry her burden to strip Deputy Blue of qualified immunity for his entry into the home. Based on the facts, this is a case like *Matlock* and unlike *Randolph*, and Deputy Blue committed no constitutional violation by entering the house on Mr. Lewis's invitation.[31] Plaintiff effectively concedes as much by failing to argue that Deputy Blue lacked consent to enter the home. The evidence shows that after her arrest, Plaintiff gave Mr. Lewis the keys to the home, in which his personal property was located and in which he had resided only two days earlier, in order for him to lock-up. Mr. Lewis subsequently asked the officers to come into the home while Plaintiff was handcuffed in the back of the Sheriff's car. The facts of this case very nearly parallel those of *Matlock*. The evidence shows that Mr. Lewis had been a co-occupant of the home for at least a few months leading up to the night of August 9, 2008, and that Deputy Blue was aware that Plaintiff and he were married. Based on this evidence, a reasonable officer in Deputy Blue's shoes would have been warranted to rely on Mr. Lewis's consent to enter the home. *Rodriguez*, 497 U.S. at 188-89.

---

[31] Based on the allegations of the Complaint, the court originally concluded that this was a case similar to *Randolph*. (Mot. to Dismiss Order 9-10 (Doc. # 22).) After reviewing the evidence in the light most favorable to Plaintiff, the court now concludes that this case is controlled by *Matlock*.

Plaintiff may have attempted to extinguish Mr. Lewis's co-occupancy on August 9, 2008, but when she gave him her keys to "lock-up," she assumed the risk that he would go into the house to retrieve his belongings, the very reason he was there in the first place.  In so doing, Plaintiff not only manifested her recognition of Mr. Lewis as a co-occupant of the home, but also assumed the risk that her husband would invite an officer into the home with him. *Matlock*, 415 U.S. at 170.[32]  Deputy Blue was clearly entitled to rely on Mr. Lewis's consent to enter the home and thus, no Fourth Amendment violation occurred based on his entry into the home.  *Randolph*, 547 U.S. at 111-12 (discussing *Matlock*).

In addition to the above precedent from *Matlock*, dicta in *Randolph* also is persuasive to support summary judgment on Plaintiff's claim that Deputy Blue unlawfully entered her home.  In *Randolph*, the majority and dissent spilled considerable ink on whether the *Randolph* rule, which grants the power of disputed permission to the objecting co-occupant, would affect the "the capacity of the police to protect domestic victims."  *Id.* at 118.  To refute the dissent's position that an abusive spouse could use the *Randolph* rule to prevent the police from entering his or her home, the majority said "it would be silly to suggest that the police would commit a tort by entering [the home], say, to give a complaining tenant the opportunity to collect belongings and get out safely . . . [a]nd since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view

---

[32] Moreover, Plaintiff witnessed the alleged intrusion and, from aught that appears in the record, did not object.

or take further action supported by any consequent probable cause."[33]  *Id.* at 118 (citing *Texas v. Brown*, 460 U.S. 730, 737-39 (1983) (plurality opinion) ("The question of whether property in plain view of police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question.")). Along those same lines, a police officer commits no constitutional tort where he or she enters a home based on a co-tenant's consent in order to protect the absent tenant's property interests.[34]  In the absence of a constitutional tort for entry into the home, Plaintiff's unreasonable search and seizure claim fails.  Deputy Blue is due qualified immunity on this claim.

### 3.     Whether Deputy Blue Is Due Qualified Immunity for Seizing Plaintiff's Pistol

The only question that remains on Plaintiff's claim of an unreasonable search and seizure of her home is whether Deputy Blue is due qualified immunity for his seizure of Plaintiff's pistol from the living room table of the home.  To support that claim, Plaintiff argues that she had a protectable interest in her freedom from unreasonable seizure of her personal effects and property.  (Doc. # 46, at 20.)  That argument is unassailable on a general level, but Plaintiff has failed to support her argument with facts and law.  Plaintiff has failed

---

[33] All constitutional claims brought under 42 U.S.C. § 1983 are tort actions.  *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).

[34] The efficacy of a co-tenant's consent is judged by whether a reasonable officer would believe that the co-tenant possessed shared authority over the premises.  *Randolph*, 547 U.S. at 109 (citing *Rodriguez*, 497 U.S. at 186).

44

to carry her two prong burden to show that Deputy Blue lacks qualified immunity for his seizure of her pistol.  All of Plaintiff's arguments in her opposition to summary judgment hinge on whether sufficient exigency existed for Deputy Blue to enter her home, and ignores Mr. Lewis's consent for Deputy Blue to be there.  Given that Deputy Blue was legally inside of Plaintiff's home, Plaintiff has not carried her burden to show that Deputy Blue's seizure of the pistol constitutes a constitutional violation, or that such right was clearly established.[35] Because Plaintiff has not attempted to meet her burden, Deputy Blue is due qualified immunity on this claim.  *See, e.g., Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (affirming a grant of summary judgment for the moving party where the nonmovant failed to raise arguments and develop genuine issues of material fact on claims of unlawful seizure and retention of personal property).

## VI.  CONCLUSION

Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 43) is GRANTED on the basis of qualified immunity.  A separate judgment will be issued.

DONE this 2nd day of March, 2011.

/s/ W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

---

[35] *See, e.g., Brown*, 460 U.S. at 739 ("[O]ur decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.").